**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CLAY A. CORNETT,

       Plaintiff,

v.                                      Case No. 3:12-cv-233-J-99TJC-MCR

LENDER PROCESSING SERVICES, INC.

       Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves a dispute between Clay Cornett and his former employer, Lender Processing Services, Inc. ("LPS"), over an employment contract. The case was tried before the Court on May 14, 15, and 16, 2013.[1] Following trial, the parties submitted proposed findings of fact and conclusions of law. (Docs. 118, 119.) After consideration of the record, this case is ready for decision pursuant to Federal Rule of Civil Procedure 52(a).[2]

## I.    FINDINGS OF FACT

LPS is a mortgage-servicing company comprised of several subdivisions that handle various aspects of the mortgage business, including defaults and foreclosures. (Def. Exs.

---

[1]  The Court has already ruled on LPS's counterclaim concerning the applicability of Cornett's non-compete because of its effect on his ability to pursue future employment and because the issue was discrete from the Court's ruling on the issues that remained. (Doc. 117.) Therefore, the Court does not address LPS's counterclaim in this Order except as discussed infra at 25.

[2]  The Court has considered all of the evidence and testimony admitted at trial. The findings of fact do not include any evidence or testimony that the Court has rejected as unreliable, inadmissible, or that it finds irrelevant. Some of these findings of fact and conclusions of law are taken from the parties' proposed findings and conclusions (Docs. 118, 119.) The Court has independently reviewed the evidence and has adopted portions of each party's submission.

107, 108.)  Cornett served LPS's predecessor company and LPS from 2000 until the spring

of 2011 as president of the company's Default Solutions Division (Doc. 105, Trial Tr. Vol.

I at 167:10-12; Pl. Ex. 26), which included the Default Title Division ("Default Title") and,

until late 2009, the Document Solutions unit ("DOCX") (Def. Exs. 107, 108).  By the end of

his tenure, Cornett supervised over 4,000 employees.  Cornett's most recent position with

LPS, embodied in his July 5, 2011 Employment Agreement (the "2011 Agreement"), was

a newly-created and highly-compensated sales position.  (Pl. Ex. 1.)  After a series of

problems within the Default Solutions Division, including investigations by state and federal

attorneys-general and a civil lawsuit in Nevada, LPS's new chief executive officer, Hugh

Harris, made the decision in January 2012 to fire Cornett with cause, pay him no

severance, and assert the non-competition provision contained in his 2011 Agreement.

(Doc. 105, Trial Tr. Vol. I at 96:5-15; Pl. Ex. 2.)  This lawsuit ensued.

### A.    DOCX

DOCX, one of the smaller business units within the Default Solutions Division,

experienced significant legal issues in 2009, which ultimately resulted in its closure.

Cornett had operational and managerial responsibility for the DOCX business unit; its

manager, Lorraine Brown, reported to Cornett.  In November 2009, LPS learned of "signing

issues" within the DOCX unit.  Specifically, one individual in the unit would sign another

individual's name on documents which were then notarized and recorded.  (Doc. 105, Trial

Tr. Vol. I at 198:6-11; Doc. 110, Trial Tr. Vol. III at 11:22-12:11.)  This improper practice

is also referred to as "surrogate signing."  LPS learned of this signing practice when it

received a complaint from an individual in Ohio who claimed LPS was improperly signing

default and foreclosure documents.  (Doc. 105, Trial Tr. Vol I at 199:16-24; Doc. 110, Trial

T. Vol. III at 11:25-12:11.)  This practice had been concealed from previous auditors and from LPS's management, including Cornett. (Doc. 105, Trial Tr. Vol. I at 40:14-41:6.) LPS promptly initiated an investigation, which revealed there was a "real problem." (Doc. 110, Trial Tr. Vol. III at 12:12-13:11.)  Although Jeff Carbiener, CEO at the time, questioned the diligence of Cornett's response to these signing issues, he acknowledged that Cornett played a role in the DOCX investigation.  (Doc. 110, Trial Tr. Vol. III at 15:22-16:22; Doc. 105, Trial Tr. Vol. I at 2:17.)  Following the investigation, Cornett participated in firing Brown, and LPS shut down DOCX. (Doc. 105, Trial Tr. Vol. I at 207:18-23; Doc. 110, Trial Tr. Vol. III at 17:4-6.)  Brown was eventually indicted and convicted of fraudulent activity arising out of her conduct relating to DOCX.  (Doc. 108, Trial Tr. Vol. II at 127:9-10.)

**B.    Events Following DOCX**

Following the DOCX investigation, LPS and Cornett entered into an employment agreement effective January 1, 2010, with a term intended to run through December 31, 2012 (the "2010 Agreement"), under which Cornett continued to serve as President of LPS's Default Solutions Division.  (Pl. Ex. 26.)  Beginning in the first quarter of 2010, Carbiener repeatedly instructed Cornett and other senior LPS executives to determine what documents were still being signed in the company's remaining divisions and to ensure there were no signing practices similar to those in DOCX.  (Doc. 110, Trial Tr. Vol. III at 19:9-13, 21:24-22:7, 24:23-25:5, 26:1-6.)

Cornett responded to Carbiener's request by providing a list of the specific documents that were still being signed by the various LPS business units.  (Pl. Ex. 115.) Cornett also directed his subordinates to identify each document still being signed; he forwarded that information to Carbiener and other members of the LPS senior

management team.  (See id.)  LPS presented no evidence that Carbiener considered Cornett's response insufficient at that time, and no communications from that time period reflect any dissatisfaction with Cornett's response to the directive.  After determining the specific nature of the signing practices that were still taking place in his units, Cornett commissioned a follow-up investigation by LPS attorney Ross Gloudeman, who prepared a report in response on October 22, 2010.  (Pl. Exs. 139, 165, 166, 167, 168, 171.)[3] Carbiener's directive and Cornett's direction to his subordinates resulted in efforts to address and evaluate signing practices.  (Pl. Exs. 115, 134, 139, 142.)  Miriam Moore, the senior director of Default Title who reported to Cornett at the time, worked on this project and held follow-up meetings with Cornett; she also forwarded information to Cornett's then-supervisor, Chief Operating Officer Eric Swenson.  (Pl. Exs. 131, 134, 139, 140.)

In addition, Carbiener created the Enterprise Risk Management Commitee ("ERM") and engaged outside counsel to conduct audits and investigations within LPS's business units.  (Doc. 110, Trial Tr. Vol. III at 18:25-19:5.)  Grace Brasington, a senior member of management who LPS hired to conduct these investigations, led the ERM unit.  (Id. at 52:12-17, 104:18-21.)   Brasington reported to a committee of senior management, including co-Chief Operating Officers Eric Swenson and Dan Scheuble, as well as senior members of the LPS legal and accounting departments.  (Doc. 105, Trial Tr. Vol. I at 88:8-10, Doc. 110, Trial Tr. Vol. III at 69:8-17, 104:12-17.)  ERM conducted a review of Default Title in the spring of 2011 and found no significant signing issues.  (Doc. 110, Trial Tr. Vol. III at 104:22-105:3.)  While Default Title was within Cornett's responsibility, no

---

[3]   The Court admitted Plaintiff's exhibits 165, 166, 167, 168 and 171 and the accompanying testimony into evidence under seal, and they will remain under seal until and unless the Court orders otherwise.

evidence suggests that Cornett was ever provided with the ERM report or was otherwise "in the loop" at the time that the ERM report was issued in April 2011.  In addition to the ERM audit, LPS conducted numerous audits of the Default Title business unit under which the document signing irregularities were later discovered.  (Doc. 105, Trial Tr. Vol. I at 87:14-16.)

In January 2011, the American Banker published an article addressing some of the same issues that later arose in fall 2011 regarding signing irregularities in the Default Title Division in Nevada.  (Pl. Ex. 124; Doc. 110, Trial Tr. Vol. III at 70:18-72:25.)  Carbiener sent an email regarding this article to several members of senior management, including Moore, addressing his concerns over the article.  (Pl. Ex. 124.)  Moore responded, explaining that the article's allegations about LPS were invalid.  (Id.)  No evidence suggests that LPS officers ever notified Cornett of the concerns identified in the article or asked him to do anything about it.

### C.    The 2011 Employment Agreement

Scheuble took over as the sole Chief Operating Officer ("COO") in March or April of 2011.  Before that time, Scheuble served as co-COO along with Eric Swenson. (Doc. 108, Trial Tr., Vol II at 185:21-186:7.)  Prior to becoming the sole COO, Scheuble had no responsibility over Cornett's operation; Cornett reported to Swenson.  (See id. at 186:25-187:3.)  Scheuble spent his first thirty to sixty days as COO looking over the operation to ensure the right management structure was in place for the challenges facing the company.  (See id. at 188:25-189:7.)  Scheuble determined that Cornett was "miscast" in his operational/managerial role.  (Doc. 108, Trial Tr. Vol. II at 189:8-16, 192:10-19.) Scheuble cited issues with financial management skills, business relationship issues,

5

DOCX, Cornett's assistant's, Cassie Curlin's, embezzlement, and other "control risk issues." (Id. at 190-194.)   Scheuble offered to put Cornett into a "sales role" because of his strength in that area and to pay him the same, if not more, compensation; Scheuble and Cornett agreed it was a "win win." (Id. at 200:13-201:7, 51:17-24.)   Carbiener likewise agreed that "there was no doubt" Cornett had value on the customer side of the business. (Doc. 110, Trial Tr. Vol. III at 42:14-22.)   In July 2011, Cornett and LPS executed a new employment agreement (the "2011 Agreement") under which Cornett's title became Executive Vice President of Strategy and Business Development in the Office of the Enterprise. (Pl. Ex. 1.)   In that position, Cornett no longer had any supervisory role over DOCX or Default Title.

At the time Cornett executed the 2011 Agreement, LPS's senior management claim to have not known about  the document execution issues in the Default Title business unit run by Moore.   Indeed, LPS promoted Moore to assume Cornett's role as president of the Default Solutions division, including operational supervision over the Default Title group. Around the same time in July 2011, Carbiener stepped down as CEO.

### D.   Nevada Legal Issues

In the fall of 2011, LPS learned that the Nevada Attorney General was investigating past document execution practices of LPS employees in the Default Title unit.  (Pl. Exs. 52, 56; see also Doc. 108, Trial Tr. Vol. II at 216:3-13.)   At that time, senior management learned that Default Title employees in the Las Vegas office were signing other employees' names and fraudulently notarizing documents. (Id.; Def. Ex. 22.)  On November 16, 2011, the Nevada Attorney General's Office announced the criminal indictments of three LPS employees (Doc. 105, Trial Tr. Vol. I at 139:17-20, Def. Exs. 21, 22, 23), and on December

6

15, 2011, the Nevada Attorney General filed a civil lawsuit against LPS alleging that LPS had engaged in deceptive business practices through DOCX and the Default Solutions Minnesota office.[4]  (Def. Ex. 28.)  The allegations by the Nevada Attorney General are based on the document execution practices of these units, representations about the processes and internal controls in Default Solutions,[5]  LPS's relationship with foreclosure attorneys, and certain fees LPS charged.  (Id.)  While these actions by the Nevada Attorney General did not occur until the fall of 2011, LPS was aware by at least October 2010 that the Nevada Attorney General had initiated an investigation concerning allegations of, among other things, unlawful document execution practices within DOCX and Default Solutions, because on October 15, 2010, the Nevada Attorney General served LPS with a subpoena duces tecum related to such allegations which stated that "[a]n investigation [was] being initiated."  (See Pl. Ex. 59.)  On November 19, 2010, LPS responded to the subpoena through its external counsel, Baker & McKenzie, giving overviews of the DOCX and Default Solutions business units, which included each unit's document execution practices.  (Pl. Ex. 54.)  This was around the same time LPS's legal department took over the investigation Cornett had commenced concerning DOCX.  (Doc. 108, Trial Tr. Vol. II at 30:5-8.)

As the Nevada legal problems were coming to a head, in October 2011, Hugh Harris was chosen from outside of LPS to serve as the new Chief Executive Officer.  (Doc. 105,

---

[4]  On August 3, 2012, the Nevada Attorney General amended its complaint to add allegations regarding the fraudulent notarizations of documents in the Default Title Las Vegas office.  (See Pl. Ex. 69.)  This addition appears to be based on the actions of the LPS employees in Nevada who were criminally indicted.  (See id. at ¶¶ 4, 104-20.)

[5]  LPS's Default Title business unit is part of Default Solutions.

Trial Tr. Vol. I at 4-10.)  Shortly thereafter, LPS fired Moore when it learned that she had lied to senior management (including Cornett) about the Default Title signing issues.  (Doc. 110, Trial Tr. Vol. III at 118:8-11; Doc. 105, Trial Tr. Vol. I at 65:1-7.)

The alleged improper signing practices in Default Title took place between 2005 and 2008.  (Doc. 105, Trial Tr. Vol. I at 215:21-216:2.)  During this time, Cornett was President of Default Solutions, which included the Default Title unit, run by Moore.  (Def. Ex. 108.)  However, by January or February of 2011, his duties were diminished and his responsibilities were shifted to Moore.  (Doc. 105, Trial Tr. Vol. I at 210:20-212:8; Doc. 108, Trial Tr. Vol. II at 31:2-33:9.)  His position was not officially changed until July 5, 2011 when he executed the new employment agreement.  (See Pl. Ex. 1.)  Cornett testified that he was not aware of the signing issues within Default Title, and no witness testified that they believed the contrary.  (Doc. 108, Trial Tr. Vol. II at 140:8-11.)  LPS executives testified uniformly that they had no reason to believe that Cornett withheld any information. (Doc. 105, Trial Tr. Vol. I at 48:21-23; Doc. 110, Trial Tr. Vol. III at 118:12-18.)  Scheuble believed that LPS later terminated Cornett based on the discovery of the same information regarding signing at Default Title on which LPS had based its termination of Moore in September 2011; he learned nothing new about the signings between when LPS fired Moore and when it fired Cornett.  (Doc. 110, Trial Tr. Vol. III at 118:1-3, 120:1-5.)  Similarly, Harris admitted that he had no justification or reason to terminate Cornett at the time LPS terminated Moore or the arrest of the three LPS employees.  (Doc. 105, Trial Tr. Vol. I at 65:8-12, 69:20-23.)

### E.    Cornett's Termination

On January 18, 2012, LPS notified Cornett that it was terminating his employment for cause, effective February 17, 2012.  (Pl. Ex. 2.)  The 2011 Agreement allowed either party to end the employment relationship at any time and for any reason.  (See id. at ¶ 8.)  Depending on the reason, however, different post-termination obligations would be triggered.  (See Pl. Ex. 1 at ¶¶ 8, 9, 12.)  Harris made the decision to terminate Cornett and made it clear that he "was not paying a [severance] package out."  (Doc. 105, Trial Tr. Vol. I at 94-95; Court Ex. 4, Harris Deposition at 85:15-86:11.)  In other words, the termination would be with "cause."    (See id.)  Harris "believed very strongly that [Cornett] had neglected his duties as a well-paid senior officer of LPS."  (Id. at 94:21-24.)  Several factors weighed into Harris's decision, but the "straw that broke the camel's back" in Harris's mind was the Nevada Attorney General filing the civil lawsuit in December 2011.  (Doc. 105, Trial Tr. Vol. I at 75:12-76:8.)  Harris believed Cornett should have known more about what was going on in his operational areas of the company and that Cornett failed to exercise adequate control over operational matters by failing to take the issues within the company as seriously as Harris believed Cornett should have.  (See id. at 129:19-22, 142:6-16.)  Finally, Harris stated that he would have fired Cornett regardless of whether LPS would have had to pay a severance or not, because he "felt at the time it was the right thing to do."  (Id. at 163:5-14.)

LPS's stated reasons for Cornett's termination with "cause" were included in the January 18, 2012 written notice:

> Your employment is being terminated as a result of, among other things, a persistent failure to perform your duties by failing to adequately manage and oversee the operations over which you were responsible and a willful neglect of your duties as a manager responsible for significant business operations.

9

By way of example, you failed to exercise adequate control over operational matters including, among others, document execution and processing. Along those lines, you failed to comply with specific direction from the Company's Chief Executive Officer to review and confirm the adequacy of document execution practices at the business units over which you were responsible. Your failure to do so has subjected the Company to regulatory scrutiny and suit including, without limitation, the lawsuit filed against the Company by the Nevada Attorney General on or about December 15, 2011.

(Pl. Ex. 2.)

## F.   Cornett's Prospective Employment

Cornett's 2011 Agreement contains a non-competition provision which only applies if his termination was with "cause." (Pl. Ex. 1 at ¶ 12.) In the written notice of termination, LPS indicated its intent to assert this non-compete clause of the agreement based on its determination that it was firing Cornett with "cause." (Pl. Ex. 2.) LPS emphasized the non-competition agreement during the January 18, 2012 termination meeting. (Doc. 108, Trial Tr. Vol. II at 70:4-7.) Before terminating Cornett, LPS drafted a letter, to be signed by LPS's human resources director Gregory Williamson, to Fidelity National Financial ("FNF") regarding Cornett's termination and his obligation not to compete with LPS. (Pl. Ex. 48.) However, Harris advised Williamson not to send the letter to FNF because he planned to meet with the executives at FNF to discuss with them their "cherry picking" of LPS employees. (Court Ex. 4, Williamson Dep. at 108:16-109:24; Doc. 105, Trial Tr. Vol. I at 111:25-113:1.)

During the spring of 2012, after LPS terminated Cornett, Harris met with Randy Quirk, President of FNF and CEO of Fidelity National Title Group, and George Scanlon, CEO of FNF. (Doc. 105, Trial Tr., Vol. I at 21:10-22:4.) Harris said his purpose in the meeting was not to discuss former employees such as Moore and Cornett going to work for FNF. (Id. at 146:25-147:4.) Rather, Harris was concerned that FNF had been hiring

10

LPS programmers, who "had all the intellectual property of [LPS's] DeskTop systems," and could take LPS's trade secrets to a competitor. (Id. at 117:21-118:1; 147:5-12.) Harris does not remember mentioning Cornett's name during the meeting. (Id. at 147:13-17.) According to Scanlon, Harris "indicated that the regulators were interested in knowing where former LPS employees were ending up," but that Cornett's name was mentioned "only in passing" and that the primary purpose of the meeting was to discuss another employee, Greg Whitworth, whom FNF had hired (Id. at 22:5-15.) Scanlon also described the meeting as being, "[v]ery professional, cordial, non-threatening." (Id. at 25:3-4.) Scanlon further testified that Harris never mentioned Cornett's non-competition agreement during the meeting. (Id. at 34:2-4.) Similarly, Quirk testified that Harris made no reference to Cornett during the meeting. (Court Ex. 5, Quirk Dep. at 5:20-23.)

After his termination, Cornett twice spoke with William Foley, FNF's Executive Chairman, about his prospective employment at FNF, and at both times they discussed LPS's assertion of the non-compete provision in Cornett's contract and that Cornett had filed this lawsuit. (Doc. 105, Trial Tr. Vol. I at 175:11-15. 176:2-8; Court Ex. 1, Foley Dep. at 9:15-21, 10:18-11:2.) Foley respects Cornett and thinks that he "would be a terrific employee." (Id. at 11:9-23.) However, although Foley could have "strongly suggested" that FNF hire Cornett, he does not do the hiring for FNF himself. (Id. at 11:17-12:3.) Cornett also met with Quirk at Foley's suggestion to discuss Cornett's potential employment at FNF. (Doc. 105, Trial Tr. Vol. I at 176:11-13, 177:7-9.) However, Quirk wanted to review this lawsuit and did not give Cornett his opinion about prospective employment at FNF. (Id. at 178:3-7.) Quirk was not particularly interested in hiring Cornett; rather, Cornett contacted Quirk for a job because Cornett was unemployed. (Court Ex. 5, Quirk Dep. at

18:20-24.)  Cornett also spoke with Peter Sadowski, head of regulatory and legal for FNF,

Chris Azur, head of ServiceLink, an FNF affiliate, and Greg Whitworth about potential

employment at FNF.  (Id. at 177:24-179.)  As of the time of trial, FNF had not offered

Cornett a position.  (Doc. 108, Trial Tr. Vol. II at 180:22-23.)

## II.   CONCLUSIONS OF LAW AND THE COURT'S DECISION

### A.   Breach of Contract (Count One)

Cornett claims that LPS breached the 2011 Agreement by: "terminating Plaintiff

without cause, unjustifiably contending that cause for termination existed, and then

refusing to pay him the [severance] sums due under paragraph 9(a) of the Agreement."

(Doc. 53, Amended Complaint at ¶ 63.)  LPS contends that Cornett was properly

terminated for cause based on his "persistent failure to perform his duties by failing to

adequately manage and oversee the operations over which [he was] responsible and a

willful neglect of [his] duties as a manager responsible for significant business operations."

(Pl. Ex. 2.)  For example, LPS contends that the document execution problems within

Cornett's business units, which resulted in the Nevada lawsuit, were consequences of his

failure to perform and/or willful neglect.  (See id.)

### 1.   Burden of Proof[6]

Under Florida law, the plaintiff in a breach of contract case must prove  (1) a valid

contract; (2) a material breach; and (3) damages.  Vega v. T-Mobile USA, Inc., 564 F.3d

1256, 1272 (11th Cir. 2009); In re Standard Jury Instructions--Contract & Bus. Cases,

SC12-1931, 2013 WL 2435441, at *21 (Fla. June 6, 2013).  Neither party disputes the

---

[6]   While one might think this would be a settled issue, the parties disagree over
which side has the burden of proof on the "cause" issue, and there appears to be no
Florida case on point.  (Compare Doc. 118 at 15 with Doc. 119 at 2-5.)

existence of a valid contract—the 2011 Agreement.  Rather, the dispute is over whether LPS breached that Agreement.

As part of Cornett's burden of proving breach, he must prove that he did all, or substantially all, of the essential things which the contract required him to do or that he was excused from doing those things, as well as that all conditions required by the contract for LPS's performance had occurred.  In re Standard Jury Instructions--Contract & Bus. Cases, 2013 WL 2435441 at *21; Escarra v. Regions Bank, 353 Fed. App'x 401, 402 (11th Cir. 2009) (holding that when a "condition precedent is an element of a contract, no recovery can be had with regard to performance of the contract absent substantial compliance with the condition precedent").  Cornett's 2011 Agreement is an at-will contract which requires LPS to pay him a severance "*If* [his] employment is terminated by: (1) [LPS] for any reason other than Cause, Death or Disability . . . ."  (Pl. Ex. 1 at ¶ 9.)  Thus, termination without cause is a condition to LPS's contractual duty to pay Cornett severance.  Therefore, Cornett must prove that he was terminated without cause to trigger LPS's duty to pay him a severance.  See Jackson v. JHD Dental, LLC, No. 1:10-cv-173-JEC, 2011 WL 2441920, at *6-7 (N.D. Ga. June 14, 2011) (applying Georgia law) (holding that the employee "bears the burden at trial of demonstrating that the condition precedent has been satisfied: that is, he was terminated without cause") (citation omitted); Hahn v. OnBoard, LLC, No. 09-3639 (MAS), 2011 WL 4737058, at *7 (D.N.J. Oct. 5, 2011) (applying New York law) (same).

In Jackson, the court explained that termination "'without cause' is a prerequisite to the additional benefit of severance pay" under a contract requiring the employer to make severance payments "only if" the employee was terminated without cause.  Id.  The court

13

noted that confusion over the burden of proof "seems to arise from cases where an employer terminates an employee in violation of a contract for a set term [(as opposed to an at-will contract)], and then tries to avoid its obligation by claiming the termination was 'for cause.'" Id. at *7.   Similarly, in Hahn, the plaintiff employee claimed that the defendant employer breached the employment agreement by failing to pay him the severance package as set forth in the contract.  2011 WL 4737058, at *7, 9.  The court placed the burden on the plaintiff to prove his breach of contract claim and viewed "termination without cause" as a condition precedent to the defendant's contractual obligation to pay the plaintiff a severance.  Id. at *7, 10.

Plaintiff cites Himes Associates, Ltd. v. Anderson, which held that the burden of proof to show that the employee was terminated for cause, and thus not entitled to severance pay under the employment agreement, was on the employer.  178 Md. App. 504, 536-39 (Md. Ct. Spec. App. 2008).  The court applied, by analogy, its holding in a "breach of just cause" employment contract case.   Id. at 539.   However, the court recognized that the cases differed in that one involved an at-will employment contract under which the employer retained the right to terminate the employee for no cause, whereas, the other involved an employment contract under which the employer could only terminate the employee for "just cause."  See id.

As noted by the court in Jackson, there is sometimes confusion over the burden of proof in "cause" termination cases.  See 2011 WL 2441920 at *7.  Had this been a fixed term contract terminable early only for cause, LPS may have had the burden of proving the requisite "cause" for termination.  However, even though the 2011 Agreement has an end date, LPS retained the right to terminate the agreement at any time.  In this situation,

14

where Cornett claims breach of the severance obligations, he must prove by a preponderance of the evidence that LPS terminated the 2011 Agreement for a reason "other than Cause, Death or Disability."[7]

## 2.    Cause

Cause for termination is defined by the 2011 Agreement at Paragraph 8(d).  There are five independent bases for termination for cause, but LPS relies on only two: (i) Cornett's persistent failure to perform duties consistent with a commercially reasonable standard of care and (ii) Cornett's willful neglect of duties.  (Pl. Ex. 2; see Pl. Ex. 1 at 8(d).)

There is no evidence that Cornett willfully neglected his duties, so the issue is whether he persistently failed to perform his duties consistent with a commercially reasonable standard of care.  For two alternative reasons, the Court finds that Cornett has proven that LPS had no cause to terminate him under the 2011 Agreement; thus, LPS breached that contract when it refused to pay Cornett his severance package.

First, under the 2011 Agreement, Cornett served as an "Executive Vice President of Strategy and Business Development in the Office of the Enterprise."  (Pl. Ex. 1 at ¶ 2.) Annex A to the contract provides a description of Cornett's duties under this agreement:

> Employee shall perform duties assigned to facilitate initiatives between the Company and its clients in order to maintain strong momentum toward reaching aggressive incremental revenue growth opportunities with such clients, along with such other duties as are assigned from time to time by the Designated Officer.

(Id. at 13.)  Cornett's new position focused on sales and business development.  Scheuble

---

[7]    Even if the Court is wrong about the burden of proof and LPS had the burden to prove that Cornett's termination was for cause, the Court's ultimate decision would be the same.

and Carbiener believe that these areas are Cornett's strength.  Both parties believed the new arrangement would be a "win-win."  In this position, Cornett no longer supervised operations, had no operational duties, and had much less responsibility, but was paid the same salary.  (Doc. 108, Trial Tr. Vol. II at 54:9-11, 139:20-140:5.)  LPS does not rely on, or provide justification for his termination arising out of, the duties Cornett performed in this new position as defined by the 2011 Agreement.[8]  (Doc. 105, Trial Tr. Vol. I at 48:24-49:16.)  Rather, the failures on which LPS relies as justification for "cause" relate only to Cornett's management and operational duties before the 2011 Agreement.

Indeed, it was partly because of LPS's knowledge of the DOCX issue and other operational deficiencies that LPS decided to replace Cornett as President of Default Solutions, supplant his December 2010 Agreement, and enter into a new 2011 Employment Agreement, giving Cornett only sales responsibilities.  Thus, knowing the fact of, though maybe not the extent of, the operational deficiencies in Cornett's company, LPS made a rational business decision: remove Cornett as President, but give him a new employment agreement, with new responsibilities that played to his strengths.

The 2011 Agreement defines "duties" as relating to Cornett's duties as Executive Vice President of Strategy and Business Development in the Office of the Enterprise and encompasses "facilitat[ing] initiatives between the Company and its clients in order to maintain strong momentum toward reaching aggressive incremental revenue growth opportunities with such clients, along with such other duties as are assigned from time to

---

[8]  Harris explained that none of the reasons for terminating Cornett arose out of his duties under the 2011 Agreement; rather they all arose out of his previous duties as President of Default Solutions.  (See Doc. 105, Trial Tr. Vol. I at 49:10-16.)

time by the Designated Officer." (Pl. Ex. 1 at ¶ 2, Annex A.) Thus, "duties" does not include Cornett's prior role as President of Default Solutions and LPS cannot rely on the issues that arose within DOCX and Default Title to support its contention that Cornett persistently failed to perform his duties under the 2011 Agreement.[9]

Alternatively, even assuming LPS could consider Cornett's historical performance as President of Default Solutions when deciding whether to terminate him for cause under the 2011 Agreement, the Court finds that Cornett has proven that LPS acted for a "reason other than cause."

It is unclear whether LPS would contend that the DOCX issue alone supports cause.[10] LPS's main complaint is that Cornett should have known about or prevented the Default Title problems and resulting civil lawsuit. However, the problems in each unit were intentionally concealed from LPS senior management, including Cornett, and resulted from criminal (or allegedly criminal) conduct. The DOCX signing issue resulted from Lorraine Brown's criminal actions which she concealed from LPS's auditors and management (Doc. 105, Trial Tr. Vol. I at 40:14-41:6), and which were eventually discovered only after an external complaint was filed with the company. (Doc. 108, Trial Tr. Vol. II at 125:13-25.)

---

[9] The Court understands that senior management may not have learned about the extent of the alleged problems within the Nevada Default Title office until after Cornett executed the 2011 Agreement. However, the parties were free to contract as they wished and LPS still had the ability to terminate Cornett under the 2011 Agreement for any reason whatsoever, albeit at a cost.

[10] Indeed, Harris stated that he had no specific evidence that Cornett was negligent with regard to DOCX and that no investigation was conducted of Cornett regarding DOCX. (Doc. 105, Trial Tr. Vol. 1 at 43:16-44:3.)

The alleged improper practices in Default Title resulted from Trafford, Sheppard, and Lawrence's allegedly criminal actions which were allegedly concealed by Moore.[11]

After DOCX happened, Carbiener instructed Cornett and others to review document execution within their business units and to ensure similar signing issues did not happen again.  Cornett responded by providing a list of the documents that LPS business units were still signing, directing his subordinates to identify each document still being signed, and forwarding the information to Carbiener and other members of the senior management team.  At the time, LPS gave no indication that Cornett's response was insufficient.  Cornett also commissioned a follow-up investigation by LPS's Chief Legal Counsel, Ross Gloudeman.  At the same time, a risk management team and outside counsel conducted audits of various business units, including Default Title.  No signing issues were discovered by anyone at that time.  It also appeared that Carbiener largely left Cornett out of the investigations and inquiries.  There is no evidence that Cornett failed to perform any duties that would have reasonably prevented or led to the earlier discovery of the Nevada Default Title signing issues.  Moreover, there was no evidence of any additional actions that Cornett could have or should have taken to unearth them.[12]

---

[11]  The Court is cognizant that Ms. Moore's case is coming up for trial.  Nothing in this opinion is intended to comment on or in any way prejudge the facts of her case.

[12]  Although senior management may not have learned of the specific issues in Default Title's Nevada office, for which three employees were criminally indicted, until fall of 2011, it appears that it had knowledge that the Nevada Attorney General was investigating document execution practices in Default Solutions (which included the Default Title business unit) and DOCX as early as October 2010 when the Nevada Attorney General served LPS with a subpoena duces tecum regarding those units.  (See Pl. Exs. 59, 54.)

Harris, the CEO who made the decision regarding Cornett's termination, knew very little about the Nevada Default Title issues at the time he fired Cornett. (Doc. 105, Trial Tr. Vol. I at 62:21-63:2.) However, as the person brought in as CEO during the midst of the Default Title/Nevada problems, he believed that all of senior management should be held accountable for their areas of responsibility. (Id. at 65:22-24; 144:24-145:13.) By the time the Nevada Attorney General filed the civil lawsuit, it was Harris's belief that "there were too many things that had happened to the company under [Cornett's] area of responsibility." (Id. at 76:6-8.) According to Harris, the Nevada lawsuit was "the straw that broke the camel's back." (Id. at 75:12-16.)

Carbiener testified that he did not know about document signing issues outside of the DOCX business unit when he stepped down as Chief Executive Officer in July 2011 and that had he known in the spring of 2011 that there were even more signing issues, that would have suggested that Cornett was incompetent and would have been "the final straw," and Cornett would have been fired.[13] (Doc. 110, Trial Tr. Vol. III at 42:23-43:25.) Similarly, Scheuble testified that had he known back in July 2011, when Cornett's role was changed, that there were more signing issues in Cornett's business units, he would not have offered Cornett a new contract; rather, he would have recommended that Cornett be

---

[13]   Carbiener emphasized issues with financials and attention to detail that, if coupled with additional signing issues, would have prompted him to fire Cornett. (Doc. 110, Trial Tr. Vol. III at 44:6-17.) However, LPS did not cite issues with financials when it terminated Cornett. LPS also claims that the embezzlement by Cornett's assistant, Cassie Curlin, also supports "cause." The Court finds that this incident is too remote and unrelated to any of the other events to have any significance. In addition, LPS at one point claimed that Cornett was negligent in other matters relating to the Dallas Cowboys suite and the Land Records of Texas (LRT). (Pl. Ex. 151; Doc. 105, Trial Tr. Vol. I at 50:16-51:20, 52: 7-53:5.) However, LPS appears to have abandoned these contentions.

terminated.  (Doc. 108, Trial Tr. Vol. II at 217:5-20.)  However, this is self-serving, "after-the-fact" evidence which the Court gives little weight.

Both Harris and Carbiener also testified that they have to rely on their subordinates. Harris stated that he relies day-to-day "one-hundred percent" on his senior leadership team.  (Doc. 105, Trial Tr. Vol. I at 124:19-21.)  Carbiener stated that he relies on his senior managers to run the organizations. (Doc. 110, Trial Tr. Vol. III at 57:25-58:4, 74:16-75:23.)  While they were speaking of Cornett, Cornett, too, was entitled to rely on the honesty of the managers who worked under him.

The Court acknowledges the harm to LPS's credibility, reputation, and finances caused by the DOCX and Default Title problems and that these issues occurred in business units under Cornett's control.  The Court also understands the desire of Harris, as the CEO brought in to "right the ship," to hold Cornett accountable.[14]  That is what makes this case a close call.  Nevertheless, LPS, for its own business reasons, and already knowing of major problems in at least one of the business units under Cornett's control, chose to give Cornett a new Employment Agreement in 2011, which included a very generous severance package unless he was terminated for cause, defined as a "persistent failure to perform duties consistent with a commercially reasonable standard of care."  By a slim margin, this Court, sitting as fact-finder, finds Cornett has shown by a preponderance of the evidence that LPS did not have cause under the 2011 Agreement to terminate him.  LPS thus must fulfill its commitment to pay Cornett his severance package.

---

[14]  There is no evidence whether any other high-ranking executives of LPS were terminated with cause for these signing issues and resulting fallout.

### 4.   Summary of Damages

#### i.   Lump Sum Severance

Section 9(a)(ii) of the 2011 Agreement provides that Cornett shall be paid $3,200,000 within thirty days of Cornett's termination without cause. (Pl. Exs. 1 at ¶ 9(a)(ii), 157 at ¶ 7.)  Because the Court has determined that LPS terminated Cornett without cause, he is entitled to damages in the amount $3,200,000.

Cornett argues that he is entitled to additional compensatory damages of $7,200,000 which he says is the amount he would have earned in bonuses and yearly salary between his date of termination and the end of the contract term, December 31, 2014.  Paragraph 9(a)(ii) of the 2011 Agreement provides that the $3,200,000 lump-sum payment "equals 200% of the sum of: (A) [Cornett's] Annual Base Salary in effect pursuant to the terms of this Agreement; and (B) the highest bonus paid to [Cornett] by [LPS] within the three (3) years preceding execution of this Agreement." (Pl. Ex. 1 at ¶ 9(a)(ii).) Cornett also testified that $3,200,000 is two years of pay and two years of bonus.  (Doc. 108, Trial Tr. Vol. II at 97:17-22.)  Under the 2011 Agreement, LPS had the ability to fire Cornett for any reason so long as it paid the agreed upon severance; it was not obligated to employ him through the end of the contract term. Awarding Cornett an additional $7,200,000 to compensate him for what he would have earned had the contract term been completed would essentially re-write the parties' agreement.  As such, Cornett is not entitled to the additional damages he seeks.

#### ii.   Stock Options

Section 9(a)(iii) of the 2011 Agreement entitles Cornett the right to exercise any stock options. In Cornett's proposed Findings of Fact and Conclusions of Law (Doc. 119)

he claims that he held 370,000 stock options at the time of his termination.  However, there is no citation to the record, and the Court has likewise been unable to locate testimony or an exhibit with this information.

Moreover, according to the Affidavit of Greg Williamson, LPS's Chief Human Resources Officer, "all of the stock options that would have vested as a result of Cornett's termination would have expired, even if deemed vested, within three months from the Date of Termination.  During this three month time frame, the stock options would been payable to Cornett at a collective zero value because the market value of LPS stock during that three month time frame was lower than Cornett's stock option price."[15]  (Pl. Ex. 157 at ¶ 8.)  Therefore, the evidence suggests that Cornett suffered no loss from loss of these stock options regardless of whether he was terminated for cause or not.  (See id.)  In the absence of any other evidence, the Court will not award damages for lost stock options.

### iii.    Cancelled Restricted Stock

Section 9(a)(iii) of the 2011 Agreement requires LPS to render immediately all restricted stock and other equity-based incentive awards that were outstanding but not vested as of the date of Cornett's termination without cause.  (Pl. Ex. 1 at ¶ 9(a)(iii).)  LPS cancelled 55,899 shares of restricted LPS common stock owned by Cornett.  (Pl. Ex. 157 at ¶ 9.)  Cornett testified that the stock was valued at approximately $26.50 per share at the time of the Rule 26(b) disclosure, for a total of $1,481.323.50. (See Doc. 18, Vol. II at 62:7-13.)  However, the value of the stock set forth in Williamson's affidavit appears to be

_____

[15]  The date of execution on Williamson's Affidavit is December 7, 2010; however, the Court presumes that the year is an error.  Indeed, LPS filed the same Affidavit in opposition to Cornett's Motion for Partial Summary Judgment on December 11, 2012 and stated that Williamson executed the Affidavit on December 7, 2012.  (Doc. 70.)

based on a different price per share as the total he arrives at is $1,270,025.28.  (Pl. Ex.

157 at ¶ 9.)  When they submit a proposed Final Judgment, the parties should attempt to

resolve this issue.

### iv.   COBRA Payments

Section 9(a)(iv) of the 2011 Agreement requires LPS to pay Cornett a lump-sum

representing thirty-six monthly payments of COBRA.  (Pl. Ex. 1 ¶ 9(a)(iv).)  The cost of the

thirty-six combined months of COBRA payments is $33,326.64.  (Pl. Ex. 157 at ¶ 11.)

### B.   Declaratory Judgment (Count Two)

Although the Court previously determined in its May 24, 2013 Order (Doc. 117) on

the non-compete issue that Cornett's claim for declaratory judgment (Count Two) was

moot, it has reconsidered this ruling because of Cornett's claim for monetary relief.  Based

on the Court's determination that LPS terminated Cornett without cause, judgment should

be entered in favor of Cornett on this claim.  Cornett seeks additional relief in the form of

monetary damages, in the amount of $2,400,000, on this claim.  This amount is based on

the amount Cornett estimates he would have made working for FNF for one year and four

months.  (Doc. 108, Trial Tr. Vol. II at 63:22-54:4.)  As discussed infra with respect to

Cornett's claim for tortious interference, whether FNF would have hired Cornett had LPS

not asserted the non-compete is too speculative for the Court to award the relief he seeks.

Therefore, the Court declines to award monetary damages on this claim.

### C.   Tortious Interference (Count Three)

Under Florida law, four elements are required to prove a claim for tortious

interference with a business relationship: (1) the existence of a business relationship that

affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of

23

the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff.  Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla.1994).

Although Cornett need not prove the existence of an employment contract with a prospective employer, or that he had already been hired or offered employment, he must prove more than a mere possibility or speculative hope of employment.  See Int'l Sales & Serv., Inc., 262 F.3d at 1154 ("A business relationship need not be evidenced by a contract, but it generally requires 'an understanding between the parties that would have been completed had the defendant not interfered.'") (quoting Ethan Allen, Inc., 647 So. 2d at 814); see also Realauction. com, LLC v. Grant St. Grp., Inc., 82 So. 3d 1056, 1060 (Fla. 4th DCA 2011).  Cornett has not proven that he and FNF had a prospective employment relationship, that FNF would have hired him, or that he had an agreement or understanding with FNF.  Foley's testimony, at best, supports only the notion that FNF would have *considered* hiring Cornett.  And, Foley said he was not the one who would make that decision.  Those who would have–Quirk and Scanlon–had not offered Cornett a position at ServiceLink or any other division of FNF at the time of trial, nor did they say they were planning to.  (Doc. 108, Trial Tr., Vol. II, at 147:11-12; Court Ex. 5, Quirk Dep. at 10:7-9.)

Cornett must also prove LPS had knowledge of and intentionally and unjustifiably interfered with a business relationship between Cornett and FNF.  The gravamen of Cornett's claim is that the combination of Harris's meeting with Quirk and Scanlon at which he "falsely" claimed that hiring Cornett would result in "regulatory scrutiny," along with LPS's "false" assertion of the non-compete, caused FNF to abandon or withdraw its plans to hire Cornett.  (See Doc. 85 at 1-2.)  The evidence does not support Cornett's version of

24

the events.  Although LPS drafted a letter to send to FNF regarding Cornett's termination and non-compete, it never sent it.  Both Harris and Scanlon testified that Cornett's name was barely mentioned during their meeting, if at all.  Further, at the time Harris met with Scanlon and Quirk, he had no idea that Cornett had reached out to Foley about a potential position.  (Doc. 105, Trial Tr. Vol. I at 148:2-6.)  Cornett has failed to prove this claim.

### D.      LPS's Counterclaim

The Court previously ruled in favor of Cornett on LPS's counterclaim for injunctive relief and specific performance based on Cornett's alleged breach of the non-competition provision contained in the 2011 Agreement.  (Doc. 117.)  Assuming for the purposes of that ruling that Cornett was bound by the non-compete, the Court found he was not in breach and that the one-year term had expired and was not to be equitably tolled.  (See id.) Because the Court has now determined that LPS terminated Cornett without cause, Cornett was never bound by the terms of the non-compete as it only went into effect if LPS terminated Cornett for cause.  (See Pl. Ex. 1 at ¶ 12.)  For this additional reason, judgment will be entered against LPS on its counterclaim.

### E.      Punitive Damages

Because the Court determines that Cornett has not proved his claim for tortious interference (Count Three), he is not entitled to punitive damages.[16]

---

[16]  This is the only claim upon which the Court could possibly have awarded punitive damages.

### F.     Attorney's Fees and Costs

As to Counts One and Two of the Amended Complaint, Cornett is entitled to reasonable attorney's fees and costs, pursuant to paragraph 22 of the 2011 Agreement. (Pl. Ex. 1 at ¶ 22.)

Accordingly, it is hereby

**ORDERED:**

The parties shall confer and, consistent with these Findings of Fact and Conclusions of Law, Cornett shall submit a proposed Final Judgment no later than **September 18, 2013**. Without waiver of any party's appellate rights, the parties should attempt to agree on a form of Final Judgment, including attorney's fees and costs. If they cannot, Cornett should file the proposed Final Judgment by **September 18, 2013**, noting any disagreements and, if necessary, file a motion for attorney's fees and costs, with supporting documentation. No later than **September 30, 2013**, LPS may respond. The Court will then enter Final Judgment as appropriate.

**DONE AND ORDERED** at Jacksonville, Florida, on this 5th day of September, 2013.[17]

TIMOTHY J. CORRIGAN
United States District Judge

---

[17]   Based on the Court's conclusion with respect to Cornett's claim for tortious interference, LPS's Motion for Judgment on Partial Findings (Doc. 107) is **DENIED as moot**.

sa.

Copies:

Counsel of Record